**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEVON HORSE SHOW AND | : | Civil Action No. 22-cv-01979 |
| COUNTRY FAIR, INC., | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| EASTTOWN TOWNSHIP, | : | Judge Nitza I. Quinones Alejandro |
| Defendant. | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, upon consideration of Defendant, Easttown

Township's Motion for Summary Judgment and any response thereto, it is hereby ORDERED

and DECREED that the Motion is GRANTED. Accordingly, all claims asserted against

Defendant are hereby dismissed, with prejudice.


_____
Hon. Nitza I. Quinones Alejandro

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEVON HORSE SHOW AND | : | Civil Action No. 22-cv-01979 |
| COUNTRY FAIR, INC., | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| EASTTOWN TOWNSHIP, | : | Judge Nitza I. Quinones Alejandro |
| Defendant. | : | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, Easttown Township ("the Township"), by and through its undersigned counsel, respectfully moves this Honorable Court for the entry of summary judgment on all claims asserted against it, with prejudice, pursuant to Rule 56 of the Federal Rules of Civil Procedure. The pleadings and discovery are closed.  There is no genuine issue as to any material fact and the Township is entitled to judgment in its favor as a matter of law. As discussed in its Brief in Support of this Motion, Plaintiff lacks any factual basis to establish a deprivation of the rights to assembly or free speech under the First Amendment of the United States Constitution. Similarly, there is an absence of evidence to establish that the Township's Special Events Ordinance is invalid on its face, that the Township treats Plaintiff differently than other similarly-situated special event sponsors, or that the costs charged to Plaintiff for police support services during its special event constitute an unlawful tax.

Respectfully submitted:

**MacMAIN LEINHAUSER PC**

Dated: September 14, 2023          By:     */s/ Stephen G. Rhoads*

David J. MacMain / Stephen G. Rhoads
433 W. Market Street, Suite 200
West Chester, PA 19382
*Attorneys for Defendant Easttown Township*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEVON HORSE SHOW AND | : | Civil Action No. 22-cv-01979 |
| COUNTRY FAIR, INC., | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| EASTTOWN TOWNSHIP, | : | Hon. Nitza I. Quinones Alejandro |
| Defendant. | : | |

**DEFENDANT'S BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ...................................................................................... iii

I.    INTRODUCTION AND SUMMARY OF UNDISPUTED FACTS ...................................... 1

II.    SUMMARY OF LEGAL ARGUMENTS ........................................................... 7

   A.    The Ordinance is valid on its face. .................................................... 7

   B.    The Township has applied the Special Events Ordinance to DHS in a fair and consistent, not disparate, manner. ......................................................... 7

   C.    The Township does not charge DHS more than its actual costs incurred. ...................... 9

   D.    The Ordinance is a valid exercise of a municipality's police powers and promotes a substantial governmental interest in maintaining safety and order. ........................... 9

   E.    The Township's charges do not constitute an unlawful tax because they represent the Township's actual costs in providing the services necessitated by the event. .......................... 10

III.    PROCEDURAL HISTORY ........................................................................ 11

IV.    STATEMENT OF QUESTIONS PRESENTED ............................................................ 11

   A.    Whether Easttown Township is entitled to entry of summary judgment on Count I of the Complaint because the Township's Special Events Ordinance is content-neutral, and therefore, a facially valid regulation of assembly and speech as to time, place and manner? .................. 11

   B.    Whether Easttown Township is entitled to entry of summary judgment on Count II of the Complaint because the evidence conclusively establishes that the Township uniformly applies its Special Events Ordinance to all sponsors of special events, including DHS, and does not otherwise treat DHS in a disparate manner? .............................................. 11

   C.    Whether Easttown Township is entitled to entry of summary judgment on Count III of the Complaint because the evidence conclusively establishes that the costs charged by the Township represent the actual costs incurred by the Township to provide support services required to maintain public safety as a result of DHS's special event, and therefore, do not represent an unlawful "tax" upon DHS? .................................................................. 12

V.    STANDARD OF REVIEW ........................................................................ 12

VI.    LEGAL ARGUMENT ............................................................................ 14

   A.    Easttown Township is entitled to the entry of summary judgment on Count I of the Complaint because the Township's Special Events Ordinance is content-neutral, and therefore, a facially valid regulation of assembly and speech as to time, place and manner. .................. 14

i

1.    The Ordinance is valid on its face because it does not tie the issuance of a special event permit, or the special conditions for issuance of the permit, to the content or message of the proposed event. ................................................................................................ 17

B.    Easttown Township is entitled to entry of summary judgment on Count II of the Complaint because there is an absence of evidence to establish that the Township applies its Special Events Ordinance in a non-uniform and/or discriminatory manner. .......................... 23

1.    The Township treats DHS in the same manner as other sponsors of special events from year to year. .............................................................................................................. 24

2.    There are no other special events similarly situated to the Devon Horse Show and Country Fair. .......................................................................................................... 24

C.    Easttown Township is entitled to entry of summary judgment on Count III of the Complaint because the evidence demonstrates that the Township charges DHS the actual costs it incurs to provide those support services required to maintain public safety as a result of the special event, and therefore, such charges do not constitute an unlawful "tax" upon DHS. .... 27

VII.    CONCLUSION .............................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ...................................................... 12, 13

*Bergdoll v. City of York*, 2001 U.S. Dist. LEXIS 45729, *6 (M.D. Pa. 2011) ............................ 13

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 13

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ................................... 17

*Goodman v. Mead Johnson and Co.*, 554 F.2d 566 (3d Cir. 1976) ............................... 13

*Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007) ....................................... 25

*Hernandez v. Borough of Palisades Park Police Dep't.*, 58 F.App'x 909 (3d Cir. 2003) .......... 13

*Hill v. Borough of Kutztown*, 455 F.3d 225 (3d Cir. 2006) ......................................... 25

*Lakewood v. Plain Dealer Pub. Co.*, 486  U.S. 750 (1988)........................................... 19

*Levenstein v. Salafsky*, 414 F.3d 767 (7th Cir. 2005) ................................................. 25

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ................................................... 13

*Miller v. Ind. Hosp.*, 843 F.2d 139 (3d Cir. 1988) ..................................................... 12

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ................................................................ 24, 25

*Scott v. Harris,* 550 U.S. 372 (2007) ..................................................................... 13

*Stradford v. Sec'y Pa. Dep't of Corr.*, 53 F.4th 67 (3d Cir. 2022) ................................ 25

*Thomas v. Chicago Park District*, 534 U.S. 316 (2002)........................................... 17, 18, 19, 27

*Walden v. St. Gobain Corp.*, 323 F.Supp.2d 637 (E.D. Pa. 2004)................................ 13

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ......................................... 17, 19, 27

*White v. Westinghouse Electric Co.,* 862 F.2d 56 (3d Cir. 1998)................................. 12

**Other Authorities**

Ordinance at § 382 .......................................................................................... 15, 16, 19

**Rules**

*Fed.R.Civ.P. 56* ............................................................................................... 12

Defendant, Easttown Township ("Easttown Township" or "the Township"), by and through its undersigned counsel, respectfully submits this brief in support of its Motion for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. For the reasons discussed herein, there are no genuine issues of material fact and the Township is entitled to the entry of summary judgment as a matter of law.

## I.   <u>INTRODUCTION AND SUMMARY OF UNDISPUTED FACTS</u>

This case involves a dispute between the municipality of Easttown Township located in Devon, Chester County, and the Devon Horse Show and Country Fair, Inc. ("DHS") over the extent to which the Township may lawfully regulate the conditions for holding special events on public or private property within the Township which are expected to attract more than 50 people. Each year, the annual Devon Horse Show and Country Fair routinely draws approximately 120,000 visitors over 11 consecutive days to the intersection of Route 30 and Dorset Road in Devon to witness equestrian events and enjoy a country fair with amusements, children's rides, retail vendors, and food and refreshment concessions, including licensed alcohol sales. DHS also permits attendees to bring their own alcohol to the event.

Due to the significant impacts historically presented by the crowds, vehicular and pedestrian traffic getting to and from DHS's enclosed show grounds, and internal security concerns, the Township has long determined the need for enhanced police protection in and around the show grounds, and crowd control and traffic management services as provided by the Township's police department that would not otherwise be required in the absence of this special event.

The Township's Special Events Ordinance expressly provides that the Township may require an event sponsor to pay the costs for necessary support services, which are:

> ***"Those services which can or must be provided by the Township to ensure that an event is conducted in such a manner as to protect the rights, safety, health, property and general welfare of its citizens.  This includes but is not limited to fire protection, police protection, crowd management and control, traffic management and solid waste management."***

(A copy of the Township's Special Events Ordinance is attached hereto as Exhibit A.)  As explained in greater detail below, DHS acknowledges the Township's obligation to provide such services and welcomes a visual police presence.

DHS advertises its special event as a fundraiser for Bryn Mawr Hospital to which it currently pledges an estimated $400,000 per year from its approximately $6,000,000 in annual revenues, most of which are generated net of expenses from its annual 11-day horse show and country fair. (*See* Cover Page of DHS's 2019 Form 990, a copy of which is attached hereto as Exhibit B.)  Those expenses include approximately $75,000 - $90,000 in police and public works services charged by the Township to support the event.  Among DHS's most notable expenses for the event is in excess of $850,000 paid in prize money to its equestrian competitors.

For many years, the Township has required DHS to apply for a special event permit in accordance with its Special Event Ordinance. Without exception, the Township has issued a permit for the event on the express condition that DHS must pay for the additional costs incurred by the Township to provide police protection, crowd control and traffic management ("support services") necessitated by the event. Each year DHS accepted those terms. (By way of example, a copy of the 2023 Special Event Permit for the DHS event is attached hereto as Exhibit C.)

DHS's Board Chair and CEO, Wayne Grafton testified that DHS acknowledges the Township's duty to provide services for police protection, crowd control and traffic management to ensure a safe environment for its many volunteers, sponsors, vendors, competitors, horses, and the families who attend the event, as well as the many Township residents and others

2

inconvenienced by the traffic impacts caused by the event. In this regard, Mr. Grafton testified: "I would never try to interject myself into what they [the Township] think is appropriate coverage." (*See*, Deposition of Wayne Grafton at pp. 62-63, a copy of which is attached hereto as Exhibit D.)

DHS's Elizabeth Wright, the DHS Board Member responsible for coordinating police, fire, EMT and internal security coverage for the event, testified that she distributes a "Police Safety Coverage Schedule" for the event which shows the post assignments for all vendors involved in safety throughout the 11-days of the event. (A copy of this schedule is attached hereto as Exhibit E) These vendors include Easttown and Tredyffrin Township Police (for internal and external posts and traffic control), Berwyn Fire Company (for fire watch and EMT services) and ELPS (DHS's private internal security company). She then conducts a "safety meeting" in the week before the event opens with those vendors (including Chief Obzud) to coordinate their services. She also meets with Chief Obzud separately to review the schedule of events so he can determine how he needs to staff the event. (*See* Deposition of Elizabeth Wright at p. 20-28 and 39, a copy of which is attached hereto as Exhibit F.) As part of the Chief's planning activities for which the $2,000 flat fee is paid, Chief Obzud prepares the "Devon Horse Show Threat Plan" which he distributes to all police officers, the Berwyn Fire Company and DHS Management. (A copy of this Threat Plan is attached hereto as Exhibit G.)

Since becoming Chair of the DHS Board, Mr. Grafton has focused on analyzing the Township's invoices for services rendered (*See* Grafton Dep. at p. 51 at Ex. D.) and "how they're charging for the show and whether those charges are fair and equitable." (*Id.* at Ex. D*.)* When asked if he had any information to indicate that the Township's charges for these services represent "anything other than actual out-of-pocket expenses" incurred by the Township to staff

the show with police coverage, he testified "No.  I'm not aware of that.  I think the issue and the charges goes to the number of hours they're covering.  If you think about it, something north of 900 hours… It just seems excessive resulting in excessive costs.  That's the issue…. And whether it's fair to both parties."  (*Id.* at pp. 70-71 at Ex. D.)

Mr. Grafton further testified that he began to question the Township's overall cost of providing police services for the annual DHS show when he became aware that "the charges started to substantially increase… it rose to a projected total of $87,000 and I believe the year was 2016 or '17."  (*Id.* at p. 46 at Ex. D).  For a number of years prior to that time, Easttown had included a 25% flat fee for administrative services on its invoices, but that practice was discontinued when the Township and DHS agreed to a flat fee of $75,000 for DHS's  2017, 2018 and 2019 annual events. (*Id.* at pp. 52-54.) (A copy of the flat fee Agreement between DHS and the Township is attached hereto as Exhibit H.)  After cancellation of the event in 2020 and 2021 due to the Pandemic, the Township did not resume the 25% flat fee for administrative services but instead instituted a flat fee of $2,000 to cover the costs of the Chief Obzud's time devoted to planning his patrols, reviewing threat assessments and attending meetings with DHS staff to discuss safety and security for the event.

In its Complaint DHS accuses the Township of overcharging for its services to subsidize its general budget (*See* Complaint at ¶ 93).  These accusations are plainly refuted by the Township's billing documentation which demonstrate beyond dispute that the Township merely passes through to DHS the additional police overtime costs it incurs in providing the support services for the special event. (*See,* for example, the Township's 2022 Invoice to DHS a copy of which is attached hereto as Exhibit I and Timesheets submitted by Chief Obzud to the Finance

Department in 2022 for payment of the officers' overtime wages earned during the DHS event, a copy of which is attached hereto as Exhibit J.)

DHS asserts that the wages charged by the Township, "time and half" for all hours worked at the event, are the result of the Township's Collective Bargaining Agreement ("CBA") with the police union.  DHS contends it bears the burden of such overtime rates of pay because the Township agreed to the union's demand to pay overtime for the hours available for work during the DHS event.  Chief Obzud testified regarding this provision in the CBA, and further explained that because of the limited number of officers on his force, and the fact that they normally work 12 hours shifts, they necessarily must put in for paid time off for certain of their requested hours at the DHS event, thereby giving up valuable vacation time in order to work those hours at overtime rates.  (*See* Deposition of David Obzud at pp. 83-91 a copy of which is attached hereto as Exhibit K.)  Even absent the CBA dictating payment at time and half for hours worked at the DHS event, the officers would be entitled to the same overtime rates in any event because they necessarily work more than 40 hours in a given week when they work the event. (*Id.* at Ex. K.)

DHS also contends that certain services provided for the event, including traffic control duties along the busy four lane state highway of Rt. 30, do not require uniformed sworn police officers at union wages. (*See* Complaint at ¶ 51- 54.)   David Obzud, the Township's Chief of Police, has remained steadfast in his professional judgment that the DHS event must be staffed with sworn police officers under his command because it presents significant risks for injury and criminal activity due to its sheer size, duration and potential as a soft target for attack. Chief Obzud testified that he has overseen staffing for the DHS annual show for 27 years, and earlier in his career worked the Kimberton Fair, a weeklong country fair in northern Chester County

attracting a similar number of patrons and requiring police staffing on a similar basis as the Devon Horse Show.  (*Id*. at pp. 6-7 at Ex. K.)  Like the DHS event, Chief Obzud recalls staffing similar posts at the Kimberton Fair event with 5-7 sworn officers. (*Id.* at Ex. K.)

Mr. Grafton admitted that Tredyffrin Township, which also provides police services for the DHS event for that portion of the DHS show grounds located in Tredyffrin Township, charges for the services of its officers at rates similar to Easttown's.  (*Id.* at p. 41-42 at Ex. D.) This confirms the reasonableness of Easttown's hourly rates of "time and half" the officer's regular union wages.

In a March 20, 2022 memorandum between counsel for the parties, the Township's solicitor, Andrew Rau, summarized the overtime rates charged by Easttown, Tredyffrin and Willistown Townships for special duty assignments.  As stated there. Easttown's hourly rates were actually 10% lower than the other two townships. (A copy of the March 20, 2022 memorandum is attached hereto as Exhibit L.)

Chief Obzud's professional judgment as to the need to utilize only sworn officers under his usual command at the Devon Horse event, as opposed to using fire/police or commercial traffic control personnel such as "Flagger Force," is supported by the expert opinion of Thomas King, the retired Chief of Police of State College, Pennsylvania.  (A copy of Mr. King's expert opinion is attached hereto as Exhibit M.)  Mr. King's 40 years of service to the home of Pennsylvania State University makes him uniquely qualified to opine on the professional judgments involved in staffing a complex special event such as the Devon Horse Show. Mr. King concluded that Chief Obzud is justified in his election to assign all police posts to sworn officers under his regular command because only then can he be reasonably assured of the

sufficiency of their training and their ability to appropriately respond to unexpected incidents. *Id.*
(*Id.* at Ex. M.)

## II.     SUMMARY OF LEGAL ARGUMENTS

### A.     The Ordinance is valid on its face.

Despite acknowledging the obvious need for sworn police services to protect the 120,000
patrons and participants involved in its event, in a transparent attempt to avoid the ordinary and
necessary expenses of conducting its event, DHS seeks a declaration that the Township's Special
Events Ordinance is both invalid on its face and unlawful as applied to DHS. DHS seeks to avoid
altogether the obligation to pay for municipal support services, typically provided by a
municipality, and for which it has historically agreed to pay as a condition of the issuance of a
permit for its annual event. It seeks to recover as damages in this case the $75,000 deposits it
paid prior to the 2022 and 2023 events to secure the necessary support services. DHS also has
refused to reimburse the Township for the balance due for the actual costs of the police services
provided in each of those years which now totals approximately $30,000.

As discussed below, the Ordinance is a proper exercise of a municipality's police power
and narrowly tailored to achieve its important governmental purpose of maintaining safety and
order.  Therefore, the Ordinance is valid on its face.

### B.     The Township has applied the Special Events Ordinance to DHS in a fair and consistent, not disparate, manner.

DHS contends without justifiable basis, let alone mention of any other sponsor of a
comparable special event, that Easttown Township "has singled out DHS for unwarranted and
unequal treatment and has applied the Special Events Ordinance in a non-uniform and illegal
manner" that violates DHS's First Amendment rights to assembly and free speech. (*See*
Complaint at Introduction and ¶ 58.)  These contentions are both factually and legally frivolous

7

because, even with the benefit of full discovery, DHS has failed to identify to a single

comparator, that is, another similarly-situated special event sponsor to which it can compare

itself in support of the argument that the Township has treated DHS differently than other special

event sponsors.  This is because no other special event held in the Township compares with the

duration of the 11-day DHS annual horse show, the 120,000 attendees and participants attracted,

or the safety and security concerns presented by the DHS event.  However, to the extent that

DHS compares its event to all other sponsors of special events, as discussed above, the evidence

shows that other events which the Townships deems require police services to ensure a safe

event are similarly charged for those services on the same basis as DHS: time and a half for

overtime duty.

Discovery has revealed that in the years 2018 – 2022, the Township also required other

sponsors of special events, as a condition of the issuance of a special event permit, to pay for

police support services at the following special events: St. David's Church (annual) Country

Auction and Fair, and Devon Yards/Urban Outfitters Opening Celebration.  In addition, the

Township required payment for police services for other equestrian events not sponsored by

DHS but held annually at the Devon Horse Show grounds, including the 6-day Dressage at

Devon.[1]  Each of these special event sponsors was charged for police services at the same "time

and a half" hourly rates as charged to DHS during its annual show which is the subject of this

litigation.  (*See* Exhibit N.)  Because DHS has failed to identify any other special event sponsor

who has been treated differently (i.e., more favorably) than DHS, the Court must find that the

---

[1] Also, the Township routinely charges DHS on the same "time and half" basis for police services
provided for its annual Fall Classic event at a cost of approximately $3,500 per year, but the charges for
this event have not been the subject of DHS's complaint.

8

DHS has failed to meet its burden to adduce evidence in support of the Township's alleged violation of equal protection under the Fourteenth Amendment.

      **C.**    **The Township does not charge DHS more than its actual costs incurred.**

The evidence clearly establishes that <u>the Township charges DHS only its actual costs incurred to provide the necessary police and public works services</u>, just as it does with all other special event sponsors for which it deems police and public works services necessary in the interests of public safety. (A sampling of special event permits issued by the Township to other event sponsors requiring payment of police and public works services is attached hereto as Exhibit N.)

There is an absence of evidence to establish that the Township charges DHS more than the actual costs of providing police and public works services. To the contrary, the testimony of the Township's Chief of Police David Obzud, the invoices issued to DHS for police and public works services, and the timesheets submitted by the Chief for the hours worked by the Township's officers indisputably confirm that the costs charged to DHS are simply a pass through of the actual additional costs paid by the Township to its officers for their extra hours worked at the DHS event, plus FICA charges on those wages and a flat $2,000 fee for patrol planning the event. In fact, the evidence shows that DHS has failed to pay the Township the full measure of those invoiced costs in 2022 and 2023.

      **D.**    **The Ordinance is a valid exercise of a municipality's police powers and promotes a substantial governmental interest in maintaining safety and order.**

The Township's Special Events Ordinance, on its face, constitutes a valid exercise of its police power because it reasonably regulates private conduct which impacts public safety. The Ordinance is narrowly tailored with regard to the time, place and manner of free assembly and

speech so as to serve the Township's legitimate and substantial interests of ensuring public safety, crowd control and traffic management while still allowing the event to take place under controlled conditions. The Ordinance is content-neutral on its face since it does not dictate different treatment, permit fees or costs for different types of assembly or speech. It does not tie its fees or the costs of providing support services to the *content of the message* of the event sponsor. The Ordinance promotes the Township's substantial governmental interest in maintaining a safe environment for special events conducted within the Township that attract many more visitors, and traffic, than would otherwise occur in the absence of a special event. For these reasons, the Ordinance is valid on its face, a determination the Court can make based on the pleadings and discovery.

E.    **The Township's charges do not constitute an unlawful tax because they represent the Township's actual costs in providing the services necessitated by the event.**

Lastly, DHS contends that the Township's alleged practice of overcharging for its support services constitutes a "tax" in violation of the Pennsylvania Constitution. This, too, is a frivolous claim because the evidence clearly demonstrates that the actual costs incurred by the Township to provide support services are passed through to the event sponsor at cost.  Absent some evidence that the Township's charges bear no rational relationship to the services actually provided to DHS, the charges cannot be regarded as an unlawful "tax."

By this litigation, DHS elected to litigate what is otherwise a well-established right of a municipality to regulate special events which impact public safety and charge the event sponsor **the actual cost of providing its services necessitated by the event**.  DHS should not be permitted to obtain the value of Easttown Township's police services without paying the actual cost of those services which otherwise will be borne by Township residents.

III.   **PROCEDURAL HISTORY**

DHS filed its Complaint in the Chester County Court of Common Pleas on April 22, 2022 alleging that Easttown Township violated its civil rights under 42 U.S.C. § 1983. (*See* Doc. No. 1.)  On May 19, 2023, Easttown Township removed the action to this Court on the basis of federal question jurisdiction. Pursuant to a stipulation of the parties extending the date for the Township's response, Easttown Township then filed its Answer with Affirmative Defenses on June 10, 2023. (*See* Doc. No. 5.)  On August 1, 2023, the Township moved for judgment on the pleadings, which motion was denied by Order of this Honorable Court on June 20, 2023. (*See* ECF Doc. No. 38.)

The parties exchanged documents and other written discovery, then took depositions of party representatives involved in the matters complained of, including DHS's Board Chair and CEO Wayne Grafton, DHS Board Member and Grounds Committee Chair Elizabeth Wright, Easttown Township Chief of Police David Obzud, (now former) Easttown Township Manager Eugene Briggs, Easttown Township Supervisor Betzy Fadem and Easttown Township Finance Director David Fiorenza.  All discovery concluded on March 31, 2023.

IV.   **STATEMENT OF QUESTIONS PRESENTED**

A.   Whether Easttown Township is entitled to entry of summary judgment on Count I of the Complaint because the Township's Special Events Ordinance is content-neutral, and therefore, a facially valid regulation of assembly and speech as to time, place and manner?

Suggested Answer:  Yes.

B.   Whether Easttown Township is entitled to entry of summary judgment on Count II of the Complaint because the evidence conclusively establishes that the Township uniformly

applies its Special Events Ordinance to all sponsors of special events, including DHS, and does

not otherwise treat DHS in a disparate manner?

   Suggested Answer:  Yes.

   C.  Whether Easttown Township is entitled to entry of summary judgment on Count

III of the Complaint because the evidence conclusively establishes that the costs charged by the

Township represent the actual costs incurred by the Township to provide support services

required to maintain public safety as a result of DHS's special event, and therefore, do not

represent an unlawful "tax" upon DHS?

   Suggested Answer:  Yes.

## V. <u>STANDARD OF REVIEW</u>

   Summary judgment is appropriate if "the pleadings, depositions, Answers to

Interrogatories, and admissions on file, together with the Affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." *Fed.R.Civ.P. 56.* Summary judgment may be granted if the moving party demonstrates

that "there exists no genuine issue of material fact that would permit a reasonable jury to find for

the nonmoving party." *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

   A fact is material when it affects the outcome of the suit under governing law and an

issue is "genuine" if a reasonable jury could possibly hold in the nonmoving party's favor with

regard to that issue. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). In determining

whether an issue of material fact exists, the Court should consider all evidence in the light most

favorable to the nonmoving party. *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3d Cir.

1998).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Scott v. Harris,* 550 U.S. 372, 380 (2007) (emphasis original). Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purpose of ruling on a motion for summary judgment." *Id.*

Indeed, "[t]he court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement." *Bergdoll v. City of York*, 2001 U.S. Dist. LEXIS 45729, *6 (M.D. Pa. 2011) (*citing, Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The party opposing summary judgment must support each essential element of that party's opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Further, "it is proper for a district court to grant summary judgment when a plaintiff fails to produce any evidence on a necessary element of her claim." *Hernandez v. Borough of Palisades Park Police Dep't.*, 58 F.App'x 909, 912 (3d Cir. 2003), *citing, Celotex*, 477 U.S. at 323-25.

Finally, "[i]f the evidence is merely colorable, where it is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. St. Gobain Corp.*, 323 F.Supp.2d 637, 642 (E.D. Pa. 2004) (*citing, Goodman v. Mead Johnson and Co.*, 554 F.2d 566, 573 (3d Cir. 1976)).

13

VI.   **LEGAL ARGUMENT**

   A.   **Easttown Township is entitled to the entry of summary judgment on Count I of the Complaint because the Township's Special Events Ordinance is content-neutral, and therefore, a facially valid regulation of assembly and <u>speech as to time, place and manner</u>.**

The Township's Special Events Ordinance regulates the conduct of special events conducted in the Township. (*See* Ex. A.)  The Ordinance requires the sponsor of such events to submit an Application for a permit for such a function, detailing the sponsor's contact information, the dates, times and purpose for the proposed event, and the estimated attendance. The sponsor agrees to assume responsibility for all "standard conditions" stated on the Application, including complying with all state and federal laws and requirements of local ordinances, maintaining liability insurance throughout the duration of the event, and satisfying all conditions of permit approval, including paying a security deposit for the support services which the Township may deem necessary to maintain public safety, no later than ten days before the event commences.

The Ordinance defines a Special Event as:

> *"A preplanned single event or series of events that, because of its nature, interest, location, promotion or any combination of similar influences, is expected to draw a large number of persons, proposed to be held on public property, or on private property but impacting public property or roadways, and/or requiring the use of public support services. "Special event" shall include, but not be limited to, races, festivals, shows, neighborhood celebrations, public events which are privately sponsored but open to the public, or similar activities generally considered to be recreational in nature. The term shall not include normal operations, activities or affairs of any duly established municipal, recreational or religious organization or institutions located in the Township, an event whose estimated total attendance of all participants is anticipated to be less than 50 people, or to any community event."*

A "community event" is defined as:

> *"Any public event officially sponsored or officially organized by the Township from time to time.*

14

The term "support services" is defined as:

> ***"Those services which can or must be provided by the Township to ensure that an event is conducted in such a manner as to protect the rights, safety, health, property and general welfare of its citizens. This includes but is not limited to fire protection, police protection, crowd management and control, traffic management and solid waste management."***

The Ordinance vests the Township Manager with authority to review an Application for Special Permit and to seek input from the Police Chief, Fire Chief, Public Works Director and Codes Director as may be appropriate under the circumstances to approve or disapprove the Application. (*See* Ordinance at § 382-4 A-D.) The Ordinance also provides that the Township personnel shall review, evaluate and estimate the cost of the support services required for the event that will be charged to the sponsor. (*Id.* at § 382-4 E.) The Township Manager has discretion to waive certain conditions if determined to be in the best interests of the Township, which occurs when the Township elects to sponsor or organize the event.  (*Id.* at § 382-4 E.) The Township Manager or his designee may require additional conditions not mentioned in the Ordinance "as may be necessary to maintain peace and order or to protect the health, safety and general welfare of the citizens of the Township or any neighboring property." (*Id.* at § 382-4 G.) The Township Manager then notifies the sponsor of the Township's decision on the Application, including if approved, the costs and/or conditions attached to the approval. (*Id.* at § 382-5.)

The Ordinance allows a sponsor to conduct up to four special events per calendar year. Of significance to this case, the Ordinance provides that a single special event may last up to eleven consecutive calendar days and still be considered a single event. (*Id.* at § 382-6 F.) Given that the Devon Horse Show and Country Fair has traditionally lasted eleven consecutive days, this provision specifically authorizes the conduct of DHS's annual Devon Horse Show and Country Fair as a special event.

15

When in reviewing an application for which the Township deems the presence of police and/or public works services necessary "*to ensure that an event is conducted in such a manner as to protect the rights, safety, health, property and general welfare of its citizens*," the Ordinance specifically authorizes the Township to require the sponsor to pay the actual costs incurred by the Township in providing the required support services associated with the special event as a condition of conducting the event. Payment of a deposit must be made to the Township no later than ten days prior to the special event. (*Id.* at § 382-7 B.) The Ordinance further provides that at the close of the special event, the actual cost of the support services shall be calculated, and after receipt of an itemized bill from the Township, either additional payment made to the Township within five days or the excess deposit released to the sponsor at the next regularly scheduled meeting of the Board of Supervisors. (*Id.* at § 382-6 & § 382-7 E.)

§ 382-9 of the Ordinance provides a necessary check on the Township Manager's discretion by providing a process of appeal for any sponsor who "contests a permit condition" imposed by the Township Manager, including the amount of deposit required for support services. This process involves an appeal to the Board of Supervisors. Following a hearing, the Board may either uphold or remove the contested condition.

Lastly, the Ordinance requires that to the extent support services required by a special event permit involve police services, the Easttown Township Police Chief is required to "keep an accurate record of all hours worked by all officers, and extra compensation shall be paid to each officer for all time worked beyond regularly scheduled tour of duty." *Id.* at § 382-11.

1.       **The Ordinance is valid on its face because it does not tie the issuance of a special event permit, or the special conditions for issuance of the permit, to the content or message of the proposed event.**

The Ordinance is facially valid because it does not contain provisions authorizing the Township Manager or his designees to approve or deny a permit, or impose special conditions with respect to any permit, on the basis of the content of the speech anticipated to occur at the proposed event. The United States Supreme Court has defined the contours of this issue such that the law is well settled in favor of Easttown Township's position. The Ordinance does not violate DHS's First Amendment right to assemble or speak freely.

The Supreme Court has held that local ordinances regulating the conduct of special events without regard for the content or message of the speech anticipated at such events constitutes a reasonable regulation of the place and manner of protected speech under the First Amendment. *Thomas v. Chicago Park District*, 534 U.S. 316 (2002); *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). In *Ward*, a New York City regulation concerning the use of the city-owned amphitheater in Central Park required performers to use a City-owned sound system and City-employed sound engineer to control sound volume. The regulation was upheld as a reasonable regulation of the place and manner of expression because it was content-neutral and narrowly tailored to serve the City's legitimate public interest in protecting citizens from unwelcome noise levels.

By contrast, three years after *Ward* was decided, in *Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992), the Supreme Court struck down a county ordinance that permitted county officials to adjust the cost of permits for parades, assemblies, demonstrations, road closings and other uses of public property and roads based on the message of the anticipated speech without providing procedural safeguards. In a case involving anticipated hate speech at a

17

rally, the Court held that regulations which allow the government to discriminate on the basis of the content of the message violate the First Amendment and declared the ordinance invalid.

In this case, however, the Township's Special Event Ordinance does not allow the Township to adjust application fees, or condition the imposition of costs for special services, based upon the nature of the anticipated speech to be delivered at the event. Rather, it involves only an assessment of the need for support services by police or public works to ensure a saft event.  If such services are deemed necessary in the judgment of the Township Manager, Chief of Police and/or Public Works Director ***"to ensure that an event is conducted in such a manner as to protect the rights, safety, health, property and general welfare of its citizens"*** then the costs incurred by the Township as a result of the event can lawfully be imposed on the event sponsor as a condition of granting the special event permit.

In *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), a case involving a Chicago city ordinance governing the issuance of permits to hold public rallies (and in this case, rallies advocating for the legalization of marijuana), the Court held that the permitting process at issue did not constitute subject-matter censorship but rather was content-neutral with respect to time, place and manner in regulating the use of a public forum. The Court specifically held that none of the City's reasons for denying permits (while also granting others to the same applicant) had anything to do with the content of speech, but rather was directed to all activity in the park. In finding the permitting ordinance facially valid, the Court acknowledged that the object of the City's permit system was to "coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event."

As in *Ward* and *Thomas*, the Township's Ordinance is facially valid because it constitutes a reasonable regulation of the place and manner of assembly and expression that is content-neutral and narrowly tailored to serve the Township's legitimate public interest in protecting all citizens from security risks, unmanaged pedestrian crowds and excessive vehicular traffic with limited parking, all of which exist only because a large number of people (in this case, historically 120,000 people over eleven days) are drawn to a densely populated suburban area by the event sponsor (DHS). There is nothing about the Ordinance which arguably renders it an unconstitutional restriction of speech.[2]

A municipal ordinance may be held invalid on its face if it gives unbridled discretion to a municipal officer to grant or reject a permit application. *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988). (Ordinance held unconstitutional because it gave the mayor boundless discretion to determine whether to grant a permit application without any right of appeal.) The Ordinance in the present case only gives the Township Manager or his designee discretion to waive certain conditions determined to be in the Township's best interest. It does not give him discretion to deny a permit for any or no reason, which was the case with the *Lakewood* ordinance. Of particular significance, § 382-9 of the Ordinance gives the permittee the right to appeal the Township Manager's decision both with respect to the denial of a permit or the imposition of a condition of the issued permit.  Because of these checks and balances, the Township's Ordinance is not invalid on its face simply because the Township Manager has

---

[2] DHS lacks any evidence whatsoever as to the nature of the speech allegedly threatened by the Ordinance. The Court may take notice that based upon the website of the Devon Horse Show and Country Fair, the event does not involve speech concerning issues of political, religious or social dialogue. (*See* www.devonhorseshow.net)

discretion to impose conditions on the event which are admittedly aimed at ensuring the safety of those attending the event.

When considering the Township's Motion for Judgment on the Pleadings, This Court previously held that the conclusory allegation that the Township Manager has "unfettered discretion" to deny a permit or impose conditions regarding payment for police services could constitute a basis for a facial challenge to an ordinance.  While this may have provided the basis for denying judgment on the pleadings, discovery has since established conclusively that the Township Manager does not exercise "unfettered discretion" by unjustifiably requiring police services for the DHS events and not for others, or by electing not to charge some sponsors for services while charging others receiving the same benefit. Given the sheer size and duration of the DHS's annual 11-day event, and the risks it presents with traffic and crowd control and cash on the premises, the need for police services during this show has never been questioned. The Township's police expert, Thomas King, confirms the undeniable need for police support services for this event.  (*See* Ex. M.)

Similarly, there is no evidence that the Township exercises unfettered discretion when deciding to charge for police services supporting a special event. If the Township Manager, in consultation with the Chief of Police and Director of Public Works, concludes that police and/or public works services **are necessary to ensure a safe event**, those services are planned by the Chief and the cost of those services becomes a condition of the event permit. The Township charges the event sponsor for those services at the same rate of "time and half" no matter who the sponsor may be.  Only in those instances where the Township participates in the sponsorship of the event does it elect to waive the cost of those services, such as has been the case with the Main Line Fire Prevention Expo and the annual Veterans' Victory 5k Run, Picnic and Bike

20

Parade. Those are events in which the Township decided that bearing the cost of police coverage was "in the best interests of the Township," as that phrase is used in the Ordinance.  Since DHS failed to come forward with evidence on its contention that the Township Manager has "unfettered discretion" to approve/disapprove permit applications, or impose conditions, the Township is entitled to summary judgment on Count I on this basis alone.

But perhaps most important to this issue is DHS's admission that **it actually desires a police presence** at its event and expects to pay for it.  Instead, **DHS simply disputes how much that police presence should cost**.  When asked "Do you have any dispute as to whether Easttown Township is allowed as a matter of law to require police services for the event?" Board Chair and CEO Wayne Grafton replied: "No, I don't…   My concern is charges and how they're charging for the show and whether those charges are fair and equitable." (See Grafton Dep. at pp. 62-63 at Exhibit D.)

Similarly, DHS's Elizabeth Wright, the board member in charge of coordinating police and security forces for the event, testified that DHS has "never attempted to dictate to Chief Obzud how to deploy and where to deploy his officers during the horse show."  (*See* Wright Dep. at pp.92-93 at Ex. F.)  She testified that "the safety and security of the event… relies upon the successful coordination" of police from Easttown and Tredyffrin Townships, Berwyn Fire Company, and EPLS private security.  When asked: "Do you rely on his [Chief Obzud's] professional judgment to decide how to deploy his forces in order to protect the folks at your event?"  She replied: "Yes."  (*Id.* at pp. 93 at Ex. F.)  Ms. Wright also confirmed that she received threat assessments from the Pennsylvania Criminal Intelligence Center and the Delaware Valley Intelligence Center each year before the show because Chief Obzud provided them. (*Id.* at pp.94.) (Copies of those Threat Assessments are attached hereto as Exhibit O.)

21

Moreover, Chief Obzud routinely prepares and distributes to his officers, DHS and its security team his own "Devon Horse Show Threat Plan" in advance of the event.  (*See* Ex. G.)

DHS fails to identify any content or message that is protected by the First Amendment. Rather, at stake is simply the commercial activity of the Devon Horse Show and Country Fair, Inc. and its related leasing activities and other fund-raising events, from which it recently reported in excess of $6,000,000 in revenue.  DHS refuses to pay the Township for the police support services which ensure that its main event, from which it generates most of those revenues, can be presented in a safe and secure manner. The only message one can reasonably take from this claim is that DHS seeks to shift to the citizens of Easttown Township the cost of protecting the public from risks necessarily caused by its event.

Lastly, DHS has failed to come forward with evidence that its rights to freedom of speech and assembly are somehow inhibited by the Township's act of requiring it to pay for the police services rendered during the event.  Even when asked:  Do you have an opinion as to whether the Easttown Township's practice of charging for its police services somehow violates the Devon Horse Show's right to freedom of assembly, Ms. Wright stated: "I have no opinion."  When asked if the Township had in any way stopped the horse show from speaking freely about equestrian events, she likewise replied: "I have no opinion on that either." And when asked whether the Township had ever "prohibited people from freely assembling at the horse show grounds" to attend the show, she replied: "No, it's been a good show."  (Wright Dep. at pp. 105-107 at Ex. F.)   Clearly, the First Amendment claim is contrived and baseless.

Mr. Grafton, on the other hand, when asked similar questions replied:

> "Well, if you're referring to our complaint issue [sic] on free speech as I see it is where government imposes charges that are so extraordinary that they limit people from coming to the grounds to participate.  And I think that's where we are with the charges that are being incurred through the special event ordinance. So in

22

that sense I do see a direct link between people being able to assemble and participate in a sport be inhibited by extraordinary charges imposed by the municipality."

(Grafton Dep at p. 95 at Ex. D.)  Despite this stated belief, Mr. Grafton could not cite any specific attendance figures for the event except to proudly state that DHS continues to sell out all box seats year after year. (*Id.* at p. 96 at Ex. D.).  Moreover, Mr. Grafton testified that the total annual attendance remains static at approximately 120,000 year after year despite the increasing cost of police services required by the Township and other costs.  (*Id.* at pp. 78-79 at Ex. D.) The continued sold-out status of the event belies his original premise that the costs of police services inhibit people from attending the show.

The evidence makes clear that the Ordinance is facially valid and not subject to a credible challenge on the grounds that it violates DHS's First Amendment rights to assembly and free speech. Accordingly, the Court should enter summary judgment in favor of the Township on Count I of the Complaint.

**B.    Easttown Township is entitled to entry of summary judgment on Count II of the Complaint because there is an absence of evidence to establish that the Township applies its Special Events Ordinance in a non-uniform and/or discriminatory manner.**

DHS alleges at Count II that the Township applies its Special Events Ordinance against it in a non-uniform and discriminatory manner because it allegedly assesses DHS for costs incurred to provide police support services *in excess* of the actual cost of providing those services for DHS's event. These allegations are contrary to the record evidence.  In fact, the evidence establishes that the Township applies its Ordinance in an even-handed manner by charging for police support services in all instances in which it determines in the exercise of reasonable professional judgment such services **are necessary to ensure public safety** for a given event. The evidence also demonstrates that the Township charges all such sponsors, not just DHS, at a

23

pay scale of "time and a half" – which is the same pay scale applied to DHS for police officers assigned to that detail.  Lastly, DHS has failed to come forward with any evidence to establish that any other special event sponsor received more favorable treatment with regard to the issuance of a special event permit or the costs assessed for support services required by the event. Because of these undisputed facts, DHS cannot prevail on its claim of disparate treatment, and judgment must be entered in favor of the Township on Count II.

1.  **The Township treats DHS in the same manner as other sponsors of special events from year to year.**

For all of the reasons discussed above, DHS has failed to come forward with evidence of disparate treatment by the Township as compared to other similarly-situated event sponsors. This is because there are no true comparator sponsors in the Township, and because for those other events which the Township deems police coverage necessary to protect public safety, it similarly charges those sponsors for police services as well.

2.  **There are no other special events similarly situated to the Devon Horse Show and Country Fair.**

To prevail on its claim of disparate treatment, DHS must come forward with evidence sufficient to establish an alleged deprivation of rights, namely that the Township applied its Ordinance in a non-uniform manner or otherwise treated DHS in a disparate manner with regard to the process of charging for police support services.

"[T]he Fourteenth Amendment proscribes unequal treatment only among persons similarly situated according to a relevant standard of comparison." *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant respects.'). An equal-protection challenge must allege more than 'broad generalities' in identifying a comparator. *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1204

24

(11th Cir. 2007).  The failure to identify similarly situated persons is fatal to an equal-protection

claim. *See Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (citing *Levenstein v.*

*Salafsky*, 414 F.3d 767, 776 (7th Cir. 2005)) (stating equal-protection claim 'must fail because

[plaintiff] does not allege the existence of similarly situated individuals')." *Stradford v. Sec'y Pa.*

*Dep't of Corr.*, 53 F.4th 67, 74 (3d Cir. 2022).

      As the Supremet Court declared in *Nordlinger*:

> "The Equal Protection Clause of the Fourteenth Amendment, § 1,
> commands that no State shall 'deny to any person within its jurisdiction the equal
> protection of the laws.' Of course, most laws differentiate in some fashion
> between classes of persons. The Equal Protection Clause does not forbid
> classifications. It simply keeps governmental decisionmakers from treating
> differently persons who are in all relevant respects alike. *F.S. Royster Guano*
> *Co.* v. *Virginia*, 253 U.S. 412, 415 (1920). Accordingly, this Court's cases are
> clear that, unless a classification warrants some form of heightened review
> because it jeopardizes exercise of a fundamental right or categorizes on the basis
> of an inherently suspect characteristic, the Equal Protection Clause requires only
> that the classification rationally further a legitimate state interest."

505 U.S. 1, 10 (1992).

      On the one hand, there is no other special event in the Township to which one may

compare the DHS Annual Horse Show and Country Fair with respect to the impacts presented as

a result of the sheer number of attendees (120,000), the duration of the event (11 consecutive

days), the volume of vehicular and pedestrian traffic over those 11 days (and nights), and the

security concerns arising from the assembly of highly valuable horses and equipment, cash

proceeds from the midway and ticket sales and the relative wealth of the patrons attracted to the

event.  Absent a true "comparator" DHS cannot establish evidence of a disparate treatment

claim.

      However, even when comparing the Township's requirement that DHS pay for required

police and public works services when compared to other special event sponsors with events of

*any* size, duration or impact on the community, the evidence is clear that the Township still does

not treat DHS unfairly or in a disparate manner.  DHS acknowledges the need for police and public works services to manage the extraordinary crowds it attracts to Easttown Township for this event and it welcomes the visual presence of uniformed police which serves as a deterrent to unlawful conduct. (*See* Ex. D and F.)

The crux of the dispute in this case involves whether the Township may insist upon using only uniformed sworn officers regularly under its command for all assigned duties, including traffic control.  The Township's Chief of Police is the municipal officer responsible for exercising professional judgment as to how to staff the event in order to ensure a safe environment.  If there were to be a catastrophic incident, such as occurred at the Boston Marathon bombing, the Charlottesville mall car attack or the numerous incidents of active shooters in schools which have become all too common, the Township (and its Chief) would be responsible for understaffing the event in light of the foreseeable risks presented by the event. Such matters of public administration are properly left within the sound professional judgment of municipal officials such as Chief Obzud.

This contention is strongly supported by the expert opinions of Thomas King, whose report supporting the Township's judgment in staffing the DHS event is attached hereto as Exhibit M.  Mr. King's experience involves many years of keeping the peace in State College, PA with its many special events which likewise require the provision of police and public works services to ensure the safety of the event for all those attending.

Because the evidence establishes that the Township evaluates all proposed special events for the potential need for police and public works services in order to **ensure the public safety of the event**, and because the Township also charges those other special event sponsors for the actual costs of providing police and public works services where it has determined the need for

26

such services, it treats DHS similarly to other event sponsors.  Accordingly, DHS cannot establish a disparate treatment claim as a matter of law and summary judgment should be entered in favor of the Township on Count II.

> **C.     Easttown Township is entitled to entry of summary judgment on Count III of the Complaint because the evidence demonstrates that the Township charges DHS the actual costs it incurs to provide those support services required to maintain public safety as a result of the special event, and therefore, such charges do not constitute an unlawful "tax" upon DHS.**

Count III of the Complaint alleges that the Ordinance establishes an unlawful "tax" on DHS simply because it requires DHS, the special event sponsor, to pay for police and public works support services which the Township deems necessary to protect public safety due to traffic and crowds drawn to the special event. As discussed above, it is well settled that a municipality may require a sponsor of a special event to pay the costs incurred by the municipality to provide public services which would not otherwise be needed in the absence of the special event. *See Thomas* and *Ward*, *supra*. This reasoning is based upon the fact that the special event sponsor, by having the event, is creating the need for additional public services and the resulting costs of providing those services. It would be unfair to expect the taxpayers of the municipality to bear the extra expense. [3] For this reason, municipalities typically codify in an ordinance those policies and procedures established for shifting such costs to the special event sponsor, as the Township has done for over half a century.

---

[3] Ignoring the existence of a lawful Special Events Ordinance, DHS also argues that the Township has an obligation to provide police protection for its special event regardless of the permit since the event occurs within the Township. DHS even alleged that its eleven-day signature event is not really a "special event at all" because it occurs every year and therefore is part of its normal operations which do not require a special permit. This, of course, ignores what actually occurs when the Devon Horse Show and Country Fair transforms the intersection of Route 30 and Dorset Road in Devon into a traffic and pedestrian scene comparable to a major league sporting event in South Philadelphia. DHS's event is anything but "normal operations."

If the Township were to charge DHS amounts *in excess of* what the Township actually paid to its police and public works employees to provide the support services, then DHS could argue that the Township's process constitutes an unlawful "tax." However, as even DHS's Board Chair, Wayne Grafton admits, the Township charges the actual costs of the services provided to support the event.  And as the text of the Ordinance confirms, the Ordinance requires the Township to provide the special event sponsor with an itemized invoice detailing the charges to be paid by the sponsor, which it has done.  (*See* Invoice at Exhibit I.) The Township's itemized invoice, and the officer's time sheets as maintained by Chief Obzud during the event and turned in to the payroll department to facilitate payment to the officers for their overtime wages (See Timesheets at Ex. J.), demonstrate that the Township only charges DHS for the actual costs incurred by the Township in providing the services at issue.

While DHS may contest the Township's choices in using only uniformed police officers at overtime union wages (rather than other less costly alternatives with lesser trained personnel), there is an absence of evidence to pursue a claim that the costs passed on to DHS exceed the Township's actual costs incurred.  Therefore, the actual costs assessed, as a matter of law, do not constitute an unlawful tax on DHS.  Accordingly, the Township is entitled to the entry of summary judgment on Count III of the Complaint.

VII.   **<u>CONCLUSION</u>**

For all of the foregoing reasons, upon review of the pleadings and all credible evidence adduced in the course of discovery, there is no genuine issue as to any material fact and the Township is entitled to the entry of summary judgment as a matter of law on each count of the Complaint.  This action should be dismissed, with prejudice.

Respectfully submitted:

**MacMAIN LEINHAUSER PC**

Dated: September 14, 2023    By:    */s/ Stephen G. Rhoads*

David J. MacMain
Stephen G. Rhoads
Attorney ID Nos. 59320/47458
433 W. Market Street
West Chester, PA 19382
484-318-7703
*Attorneys for Defendant Easttown Township*

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen G. Rhoads, hereby certify that on this day I caused to be served a copy of the foregoing Motion for Judgment on the Pleadings with accompanying brief in support and proposed order upon the following counsel of record via the ECF system and by email:

James Sargent, Jr., Esq.
Vince Donahue, Esq.
Lamb McErlane, P.C.
24 E. Market Street
PO Box 565
West Chester, PA 19381
jsargent@lambmcerlane.com
vdonohue@lambmcerlane.com
*Attorneys for Plaintiffs*

**MacMAIN LEINHAUSER PC**

Dated:  September 14, 2023          By:          */s/Stephen G. Rhoads*
David J. MacMain
Attorney I.D. No. 59320
Stephen G. Rhoads
Attorney I.D. No. 47458
433 W. Market Street, Suite 200
West Chester, PA 19382
*Attorneys for Defendant Easttown Township*