# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DEVON HORSE SHOW & COUNTY FAIR, INC.,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | **NO. 22-1979** |
| | : | |
| **v.** | : | |
| | : | |
| **EASTTOWN TOWNSHIP,** | : | |
| *Defendant.* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                    JULY 7, 2026

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiff Devon Horse Show & County Fair, Inc., ("Plaintiff" or "Devon"), filed a state-court action against Easttown Township, ("Defendant" or the "Township"), averring that Defendant violated the First Amendment of the United State Constitution and the Uniformity Clause of the Pennsylvania Constitution when implementing its "Special Events" Ordinance, codified at Chapter 382 of the Code of Easttown Township, (the "Ordinance"). Specifically, Devon alleges both a facial and *as-applied* challenge to the Ordinance under the First Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983, ("Section 1983"), (Counts I and II, respectively), and a challenge to the Ordinance under the Uniformity Clause of the Pennsylvania Constitution, (Count III). Devon contends that the Township required Devon to pay exorbitant, unreasonable, and unconstitutional fees as a condition for the issuance of permits to host its annual show, the Devon Horse Show & Country Fair, (the "Devon Horse Show"), in 2022, 2023, and 2024. The Township disputes the claims. The matter was subsequently removed to this court.

After discovery was completed, the parties filed cross-motions for summary judgment. (ECF 40, 41). By Memorandum Opinion and Order issued on October 9, 2024, (ECF 49, 50), this

Court found that the Ordinance was facially unconstitutional,[1] but reserved Devons' First Amendment *as-applied* challenge[2] and Uniformity Clause claim[3] for a bench trial, which was held from October 7 to October 9, 2025.  (*See* ECF 85, 86, 87).  Said Opinion is incorporated herein by reference.  At the conclusion of the bench trial, the parties, represented by counsel, were instructed

---

[1]    In granting summary judgment on Devon's First Amendment facial challenge, this Court found, *inter alia*, the following:

> Given the Township's "unlimited discretion" to grant a permit, assess costs, and impose other conditions, the Ordinance is "ripe for abuse." *Nationalist Movement*[ *v. City of York*], [481 F.3d 186], [] 185-86 [(3d Cir. 2007)].  As currently drafted, the Ordinance "could easily be used to punish (or intimidate) speakers based on the content of their messages." *Id.* at 186-87.  "Given the substantial expense that could be levied upon a speaker, and the almost limitless possibility of abuse," the Ordinance, as written, impermissibly "chills constitutionally-protected speech."  *Id.* at 187.  As such, the Ordinance is unconstitutional on its face.  Accordingly, summary judgment is entered in favor of Plaintiff on Count I.

(ECF 49 at p. 19).

[2]    As to Devon's *as-applied* challenge, this Court found, *inter alia*:

> [i]n the absence of any discussion of the necessary elements of Plaintiff's as applied claim, neither party has met its summary judgment burden as a movant:  Plaintiff has failed to show how the undisputed evidence satisfies each of the elements of its claim; and Defendant has failed to show how either the undisputed evidence requires entry of judgment in Defendant's favor or how Plaintiff has failed to present evidence sufficient to meet each element of the claim.  Accordingly, the parties' cross motions for summary judgment on Plaintiff's as-applied claim (Count II) are denied.

(ECF 49 at pp. 19-20).

[3]    As to Devon's Uniformity Clause claim, this Court found, *inter alia*:

> [t]he parties have proffered conflicting evidence as to whether the fees charged by the Township for support services are the actual costs incurred, reasonable, and/or "commensurate with similar services provided by private enterprise." *Ridley Arms*[*, Inc. v. Ridley Twp.*], 531 A.2d 414[,] 418 [(Pa. 1987)].  For instance, Plaintiff has presented evidence that suggests the fees for support services were motivated by an intent to generate income, greatly exceeded amounts charged by the private sector for similar services, and increased dramatically compared to prior years.  Defendant, on the other hand, has proffered evidence in the form of testimony, invoices, and time sheets that suggests that the costs amounted to the Township's actual costs for the services.  This evidence creates a genuine dispute of material fact with respect to the reasonableness of the costs.

(ECF 49 at p. 22).

to, and did, submit proposed findings of fact and conclusions of law, as well as responses to the opposing parties' submissions. (ECF 81, 82, 83, 84).

**FINDINGS OF FACT**

In rendering this Opinion, this Court has carefully reviewed the parties' submissions and filings, the evidentiary record, and the trial testimony, including an assessment of the credibility of the testifying witnesses. Pursuant to Rule 52, this Court makes the following findings of fact:[4]

*A.*      *The Devon Horse Show*

Devon is a non-profit corporation that has hosted annually the Devon Horse Show since 1896.[5] The Devon Horse Show is an eleven-day event performed on private property owned by the Devon Horse Show Foundation,[6] a separate and distinct legal entity. The private property lies primarily in the Township and partly in Tredyffrin Township. As a non-profit entity, Devon pays roughly $180,000 in annual taxes to the County, School District, and Township. Approximately 100,000 people attend the Horse Show each year, with an estimated average of 16,000 people attending on a single night of activities.[7] With the exception of seven smaller events, Devon's private grounds are unused for the majority of the year.[8] The grounds are located approximately two miles from the Township police station.[9]

---

[4]      At trial, the Court heard argument from the parties' counsel and testimony from the following individuals: Eugene Briggs, who served as interim manager for the Township for approximately a year and served as assistant Township manager prior; Eastown Township Police Chief, David Obzud; Devon Horse Show organizer, Elizabeth Wright; and Wayne Grafton, the CEO and Chairman of the Horseshow. (*See generally* ECF 85, 86, 87). Plaintiff also provided the designated testimony of David Fiorenza, the Finance Director for the Township and Elizabeth Fadem, former Easttown Township Supervisor. (*See* Pl.'s Trial Exs. 34, 35).

[5]      (ECF 81 at ¶¶ 1-3).

[6]      (Stipulated Facts, ECF 69 at ¶ 1).

[7]      (ECF 81 at ¶¶ 11-12).

[8]      (Stipulated Facts, ECF 69 at ¶ 11); (ECF 81 at ¶¶ 13-17).

[9]      (Stipulated Facts, ECF 69 at ¶ 69).

**B.     *Collective Bargaining Agreement between the Township and the Township's Police Association***

On February 23, 2007, the Easttown Township Police Association and the Township executed a collective bargaining agreement, ("CBA"),[10] effective from January 1, 2007 until December 31, 2011.[11]  The CBA was extended by settlement agreements on multiple occasions.[12]  Pursuant to a settlement agreement that amended the CBA for the period effective January 1, 2012 through December 31, 2015, a new provision, entitled "Special Details – Devon Horse Show," was added to the CBA.[13]  The new provision provided the following:

> The parties recognize that the Devon Horse Show and activities related to it provide a unique opportunity for members of the Police Department to provide services and generate income to the mutual benefit of the parties.  Accordingly, they agree that during this particular detail, the officers shall receive a rate of $55/hour and that the Township shall add a reasonable administrative fee, so as to maintain the relationship with the Horse Show and preserve the mutual advantage received by the parties.

> The members of the bargaining unit and Police management seek a fair and equitable distribution of the income that each may receive from this opportunity.  Accordingly, the members of the bargaining unit and Police management agree to distribute those opportunities equitably between them, taking into account the opportunity for police management to earn compensation administrative services.

Notably, as of December 31, 2024, the CBA continues to contain this provision.[14]  No other event in the Township is specifically referenced in the CBA as a "unique opportunity" for the Township and its police department to earn compensation.

**C.     *The Special Event Ordinance***

In 1959, the Township first enacted the Special Events Ordinance, then amended it in its entirety in 2013 and amended it, *in part*, in 2018 and 2025.[15]  The 2013 version of the Ordinance was the first iteration that gave the Township the authority to dictate unilaterally what support services would be required as a

---

[10]     (ECF 2 at ¶ 65); (Compl. Ex. F, ECF 2-2, at p. 44).

[11]     (Compl. Ex. F, ECF 2-2, at p. 10).

[12]     (Compl. Ex. F, ECF 2-2 at pp. 45-60); (Stipulated Facts, ECF 69 at ¶ 20); (ECF 81 at ¶¶ 13-17).

[13]     (Compl. Ex. F, ECF 2-2 at pp. 45-54); (Stipulated Facts, ECF 69 at ¶¶ 20-21);
[14]     (ECF 40-3 at p. 61); (Joint Trial Exhibit 2 – DHS 000907).

[15]     (Stipulated Facts, ECF 69 at ¶¶ 18-19, 23-24).

condition of the issuance of a Special Event Permit.[16]  Prior to the 2013 Ordinance, an event sponsor and the Township would agree on the level of Township support services and the price to be paid for those services.[17]

The Ordinance, as amended in 2018, is the version at issue in this case, (hereinafter, the "2018 Ordinance").[18]  Specifically, the 2018 Ordinance provided that "[n]o sponsor, person, association, firm corporation, or other entity shall conduct any special event or community event in Easttown Township without first having obtained a permit from the Township."[19]  Section 382-1 of the Ordinance, defines "Special Event" as:

> A preplanned single event or series of events that, because of its nature, interest, location, promotion or any combination of similar influences, is expected to draw a large number of persons, proposed to be held on public property, or on private property but impacting public property or roadways, and/or requiring the use of public support services.  "Special Event" shall include, but not be limited to, races, festivals, shows, neighborhood celebrations, public events which are privately sponsored but open to the public, or similar activities generally considered to be recreational in nature.  The term shall not include the normal operations, activities or affairs of any duly established municipal, recreational or religious organization or institutions located in the Township, an event whose estimated total attendance of all participants is anticipated to be less than 50 people, or to any community event.[20]

The 2018 Ordinance further provided that "[t]he Township shall develop an application for a permit for a special event . . . [which] shall be submitted by the [Event Sponsor] to the Township Manager or his designee no less than 30 days prior to the special event[.]"[21]  With respect to the Township's application review process, the 2018 Ordinance provided that its process was meant to "provide a mechanism which will allow the Township to plan, evaluate and coordinate any special event or community event, which will allow the establishment of terms and conditions within which the event may be conducted and will allow the sponsor or

---

[16]    (*Id.* at ¶ 22).

[17]    (*Id.*).

[18]    (*Id.* at ¶¶ 23, 25).

[19]    (Joint Trial Ex. 1 at § 382-2); (Stipulated Facts, ECF 69 at ¶ 28).

[20]    (Stipulated Facts, ECF 69 at ¶ 26); (Joint Trial Ex. 1 at § 382-1).

[21]    (Joint Trial Ex. 1 at § 382-3(A)).

any involved event planner to plan and manage the even within the context of the established terms and conditions."[22]

The 2018 Ordinance further provided that "personnel participating in the Township review of the special event or community event are charged with the responsibility of reviewing, evaluating and recommending to the Township Manager or his designee the approval/disapproval of any special event or community event on its own merits."[23]  The following individuals were required to provide input in such reviews, *to wit*:  "(1) Township Manager, (2) Police Chief, (3) Fire Chief, (4) Public Works Director, and (5) Codes Director[,]" in addition to other "Township personnel [who] may be involved at the discretion of the Township Manager or his designee."[24]  However, the "Township Manager or his designee [could] waive review by any of the listed Township officials."[25]

The 2018 Ordinance set forth a non-exhaustive list of criteria and factors to guide the review process:

(1) Is the proposed event considered desirable for the Township?

(2) Does the Township have the ability to provide, if needed, the required support services regardless of who bears the cost?

(3) Does the proposed event adversely affect the normal and necessary functions of the support services to the Township?

(4) Does the proposed event conflict with any other proposed events or activities?[26]

Under the 2018 Ordinance, personnel reviewing the proposed Special Event "shall also review, evaluate and estimate . . . the cost of the support services that will be charged to the [Event] [S]ponsor."[27]  "Support Services" were defined as those "which can or must be provided by the Township to ensure that an event is conducted in such a manner as to protect the rights, safety, health, property and general welfare of its citizens" including but not limited to "fire protection, police protection, crowd management and control, traffic management and solid waste

---

[22]   (Joint Trial Ex. 1 at § 382-4(A)); (Stipulated Facts, ECF 69 at ¶ 29).

[23]   (Joint Trial Ex. 1 at § 382-4(D)).

[24]   (Joint Trial Ex. 1 at §§ 382-4(B)-(C)); (Stipulated Facts, ECF 69 at ¶ 30).

[25]   (Joint Trial Ex. 1 at § 382-4(C)).

[26]   (Joint Trial Ex. 1 at § 382-4(E)); (Stipulated Facts, ECF 69 at ¶ 31).

[27]   (Joint Trial Ex. 1 at § 382-4(E)).

management."[28]  If the Police Department provided support services, the Police Chief was required to keep an accurate record of all hours worked by all officers, and extra compensation shall be paid to each officer for all time worked beyond regularly scheduled tour of duty, less the same deduction made from his usual compensation, at appropriate rates.  The Township delegated all responsibility for assessing the need and the extent of police staffing to Chief of the Easttown Township Police Department, David Obzud, ("Police Chief Obzud").

Following this review, the reviewing personnel "shall recommend either approval or disapproval of a proposed [S]pecial [E]vent . . . , submit the conditions required if approved and submit an estimate of costs of support services and any other related issues to the Township Manager or his designee . . ."[29] "Final approval of a permit . . . shall be made by the Township Manager or his designee" who "shall notify the [Event] [S]ponsor of a [S]pecial [E]vent within five days of the final decision."[30]

Upon receiving approval, an event sponsor for an event with estimated costs in excess of $7,500 shall, *inter alia*, "secure [100% of] the costs associated with necessary support services" no later than 10 days prior to the Special Event.[31]

Following the conclusion of the Special Event, based upon the deposit payment made to its police officers and public works employees/contractors, the 2018 Ordinance provided that the Township must prepare an invoice of the actual costs incurred by the Township for the police and public works support services provided to the Special Event.  If the actual costs incurred by the Township were determined to exceed the amount of the deposit paid, the event sponsor was required to reimburse the Township for the difference in amount of the deposit paid and the invoice amount; the event sponsor is required to reimburse the Township for the amount of additional costs incurred by the Township.  If the actual costs incurred by were less than the amount of the deposit paid to the Township, then the Township refunds the difference to the Event Sponsor.[32]

---

[28]  (*Id.* at § 382-1).

[29]  (*Id.* at § 382-4(F)).

[30]  (*Id.* at §§ 382-4(G), 382-5).

[31]  (*Id.* at § 382-7(B)(3)).

[32]  (ECF 82 at ¶ 23) (citing Joint Trial Ex. 1 at § 382-7(E)).

**D.**     ***Devon Horse Show Security***

During the annual Devon Horse Show, the grounds are accessible to patrons by two controlled entrances and exits.[33]  The grounds are enclosed by a combination of walls, fences, and buildings.[34]

Security for the Devon Horse Show traditionally has involved the coordination of four separate providers, *to wit*: private security personnel provided by a reputable private security contractor hired by Devon; emergency medical services provided at Devon's expense by the local fire department; officers stationed by the Chief of the Easttown Township Police Department, and billed to Devon as a condition of a special permit; and officers provided by the Tredyffrin Township Police Department, under an agreement with Devon to patrol that portion of Devon's premises located in Tredyffrin Township.[35]

Each year, in consultation with Devon's representatives, Police Chief Obzud prepares a Safety Plan to coordinate with all those responsible for ensuring a safe event, including Devon Horse Show staff, its private security contractor who works inside the Show grounds, Berwyn Fire Company which provides fire watch and EMS services, and Tredyffrin Township Police which patrols the particular portion of the grounds situated in Tredyffrin Township.

For the years that Devon hosted the Devon Horse Show, Devon has never refused a police presence around its grounds.  In fact, Devon has hired several Tredyffrin Township police officers to assist with security on the portion of Devon's grounds in Tredyffrin Township.[36]  Pursuant to an agreement between Devon and the Tredyffrin Police Department, Devon paid Tredyffrin officers stationed outside the event a fixed amount of $141.00 per hour.[37]

As a cost-saving measure, Devon has requested permission from the Township to use fire police and/or private contractors to control pedestrians and vehicular traffic outside Devon's gates and patrolling the perimeters outside the grounds.[38]  The Township has refused permission.[39]

---

[33]     (Stipulated Facts, ECF 69 at ¶ 7).

[34]     (*Id.* at ¶ 7).

[35]     (*Id.* at ¶ 12).

[36]     (*Id.* at ¶ 16).

[37]     (*Id.* at ¶ 17).  In contrast, the Easttown officer has a sliding scale of rates equal to 150% of each officer's base hourly wage as mandated by the Township Ordinance, ranging from $77 to $141 per hour. (Stipulated Facts, ECF 69 at ¶ 17).

[38]     (*Id.* at ¶ 15).

[39]     (*Id.*).

Pursuant to the 2018 Ordinance, the Township Manager was responsible for overseeing the Township's special event permit process, which involved circulating a Special Event Permit application to the Township's Chief of Police, the local Fire Chief, the Public Works Department, and the Codes Department.[40]  With respect to the Township's requirements for police presence at the Devon Horse Show, as noted, the Township Managers and other Township personnel deferred entirely that decision to Police Chief Obzud at his discretion.[41]

Police Chief Obzud alone determined the total number of officers required to be present at each Devon Horse Show at any given time and the total hours of police staffing to provide security and traffic/pedestrian control at the Devon Horse Show.[42]  From his own calculations, Police Chief Obzud unilaterally allocated those hours by offering them to the Township's officers.[43]  Then, considering the officers who accepted to work the Devon Horse Show, the number of hours each offered to work, and their respective hourly rates of pay, Police Chief Obzud calculated an estimated figure for the cost of the Township's police support services.[44]

Police Chief Obzud and Lieutenant Michael Sesher, ("Lieutenant Sesher"), are salaried employees and are overtime exempt under the Fair Labor Standards Act.[45]  However, the Township bills Devon for Police Chief Obzud's and Lieutenant Sesher's time worked at Devon at a rate equal to 150% of what their regular hourly rate for all hours that Police Chief Obzud and Lieutenant Sesher worked at the Horse Show.[46]

For each of the Devon Horse Show events held from 2014 to 2024, the Township provided Devon the following information: the pre-event estimate of hours police offered to work as calculated by Police Chief Obzud; the pre-event estimate of charges which formed the basis for the required permit deposit amount; the post-event calculation of the actual hours of police service provided; the post-event charges for police services imposed on Devon; the actual amount paid by Devon; and the remaining amount claimed by Township as unpaid by Devon.[47]

---

[40]    (*Id.* at ¶ 33).

[41]    (*Id.* at ¶¶ 34-35).

[42]    (*Id.* at ¶¶ 42-43).

[43]    (*Id.* at ¶ 43).

[44]    (*Id.* at ¶ 45).

[45]    (*Id.* at ¶ 52).

[46]    (*Id.* at ¶ 53.

[47]    (ECF 81 at ¶ 102).

**E.      *Permits for Devon Horse Show Events from 2014 to 2019***

For the 2014 Devon Horse Show, the Township charged Devon (and Devon paid) support services fees totaling $75,235.50.[48]  In 2015, the Township charged, and Devon paid, $74,622.92 in support services fees.[49]  In 2016, the Township charged Devon $84,882.52 in support services fees, but upon Devon's objections to the amount, the Township and Devon entered into a settlement agreement fixing support costs at $75,000.[50]  Devon paid this fixed amount of $75, 000 for the Devon Horse Shows hosted from 2016 to 2019.  Due to the COVID-19 pandemic, the Devon Horse Show was not held in 2020 or 2021.[51]

**F.      *Permits for Devon Horse Show Events from 2022 to 2024***

In advance of the 2022 Devon Horse Show, the Township required Devon pay a deposit of $130,000 for support services despite Police Chief Obzud having estimated the cost of the support services to be $110,000.[52]  Devon and the Township Supervisor Elizabeth Fadem questioned the $130,000 deposit requirement and believed the amount was not reasonable.[53]  Police Chief Obzud acknowledged the original deposit request errantly included costs for related services to be charged to a separate business and prepared a revised estimate totaling $99,070.64.[54]

At the 2022 Devon Horse Show, Police Chief Obzud logged 100.75 hours – an average of 9.16 hours per day –  and Lieutenant Sesher logged 108.5 hours – an average of 9.86 hours per day – resulting in a charge to Devon for the Police Chief's and his Lieutenant's services of $27,201.[55]  The parties agreed to a pre-event deposit of $75,000, which Plaintiff paid upon the issuance of the permits, with both parties reserving all claims and defenses pending this litigation.[56]  On April 22, 2022, Plaintiff initiated this litigation.[57]

---

[48]      (ECF 81 at ¶ 103); (Stipulated Facts Ex. A, ECF 69).

[49]      (ECF 81 at ¶ 104); (Stipulated Facts Ex. A, ECF 69).

[50]      (ECF 81 at ¶¶ 105-106); (Stipulated Facts Ex. A, ECF 69).

[51]      (ECF 81 at ¶ 107); (Stipulated Facts Ex. A, ECF 69).

[52]      (Stipulated Facts, ECF 69 at ¶ 76).

[53]      (ECF 81 at ¶ ); (Stipulated Facts, ECFF 69 at ¶ 77).

[54]      (Stipulated Facts, ECF 69 at ¶ 77); (Joint Ex. 8).

[55]      (Stipulated Facts, ECF 69 at ¶ 59).

[56]      (*Id.* at ¶ 79).

[57]      (ECF 2).

In 2023, the Township provided Devon an estimate of $93,142.60 and an invoice of $97,527.53 for support services.[58]  Police Chief Obzud logged 85 hours at the Horse Show and Lieutenant Sesher logged 95 hours, resulting in a charge to Devon of $23,013.[59]  In 2024, Township provided Devon an estimate of $95,474.53 and an invoice of $91,658.66.[60]  Police Chief Obzud logged 78 hours at the Devon Horse Show and Lieutenant Sesher logged 81.5 hours, resulting in a charge to Devon of $21,698.[61]  Pursuant to the parties' agreement, Devon paid $75,000 to the Township as a deposit for support services fees for the 2023 and 2024 Devon Horse Shows.[62]  The remaining amount of permit fees claimed by the Township for 2022 to 2024 is $51,128 – $11,941 for 2022, $22,528 for 2023, and $16,659 for 2024.[63]

**CONCLUSIONS OF LAW**

As noted, by Memorandum Opinion and Order addressing the parties cross-motions for summary judgment, this Court determined that the 2018 Ordinance was facially unconstitutional, but because there was a genuine issue of material fact on the *as-applied* claim and the Pennsylvania Constitution claim, it deferred the issues for trial.  (ECF 49, 50).  Consequently, the issues to be determined are:  (1) whether the 2018 Ordinance *as-applied* to the 2022, 2023, and 2024 Devon Horse Shows violated Devon's First Amendment rights; and (2) whether the fees the Township charged for the 2022, 2023, and 2024 Special Event Permits were unreasonable and, therefore, an unlawful tax; *i.e.* that such application of the Ordinance violated the Pennsylvania Constitution's Uniformity Clause.

**A.      *Plaintiff's First Amendment "As Applied" Challenge to the Ordinance (Count II)***

The First Amendment of the United States Constitution provides that:  "Congress shall make no law . . . abridging the freedom of speech, . . . or the right of the people peaceably to

---

[58]      (Stipulated Facts, ECF 69 at ¶¶ 82-83); (Stipulated Facts Ex. A, ECF 69).

[59]      (Stipulated Facts, ECF 69 at ¶¶ 60).

[60]      (Stipulated Facts, ECF 69 at ¶¶ 84-85); (Stipulated Facts Ex. A, ECF 69).

[61]      (Stipulated Facts, ECF 69 at ¶¶ 61).

[62]      (*Id.* at ¶ 88).

[63]      (Stipulated Facts Ex. A, ECF 69).

assemble, . . . ." U.S. Const. amend. I. "[T]he analytical framework governing free speech claims . . . typically begins with an assessment of whether the challenged law restricts speech based upon its content." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016); *see also Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015) ("[T]he crucial first step in the content-neutrality analysis: determining whether the law is content neutral on its face").

A First Amendment challenge to a law or ordinance involving a licensing or permitting scheme can be either an attack as being *facially* unconstitutional or an attack that the law is unconstitutional *as-applied*, *i.e.* arguing that the government entity has applied the law to the litigant in a way that violates its First Amendment rights. "[A] facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). In contrast, an "*as-applied* challenge" to an ordinance "does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id*. "The distinction between a facial and *as-applied* attack, then, 'goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint.'" *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 412 (W.D. Pa. 2020) (quoting *Citizens United v. FEC,* 558 U.S. 310, 331 (2010)); *see also Bruni v. City of Pittsburgh*, 824 F.3d 353, 362 (3d Cir. 2016) ("The distinction between facial and *as-applied* constitutional challenges, then, is of critical importance in determining the remedy to be provided.").

"The substantive rule of law is the same for both [facial and *as-applied*] challenges.'" *Boockvar*, 493 F. Supp. 3d at 412 (alteration in original) (quoting *Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014)); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 509 n.5 (D.C. Cir. 2016) ("Indeed, the substantive rule of law is the same for both *as-applied* and facial First Amendment challenges.") (cleaned up); *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("The underlying constitutional standard, however, is

no different [in an *as-applied* challenge] th[a]n in a facial challenge."). "In other words, *how* one must demonstrate the statute's invalidity remains the same for both type of challenges, namely, by showing that a specific rule of law, usually a constitutional rule of law, invalidates the statute, whether in a personal application or to all." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006), *abrogated on other grounds by Bond v. United States*, 564 U.S. 211 (2011) (emphasis in original).

An ordinance that requires a permit and fee before authorizing a speech or assembly in a public forum is a "prior restraint" on speech and carries a presumption against its validity. *The Nationalist Movement v. City of York*, 481 F.3d 178, 183 (3d Cir. 2007) (citing *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)). This type of prior restraint is only constitutional "where it does 'not delegate overly broad licensing discretion to a government official' and is a valid time, place, and manner restriction, *i.e.*, it leaves open ample alternatives for communication and is content-neutral and narrowly tailored to serve a significant governmental interest." *Id.* (quoting *Forsyth Cnty.*, 505 U.S. at 130). Notably, a permit fee scheme is invalid when it does not "prescribe adequate standards" for government officials to follow when determining the fee. *Forsyth Cnty.*, 505 U.S. at 130. As this Court and other courts have held, to comply with the Constitution, an ordinance "must contain 'narrow, objective, and definite standards to guide the licensing authority.'" *Id.* (quoting *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969)). These standards must involve the "appraisal of facts, the exercise of judgment, and the formation of an opinion." *Id.* (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)).

At the conclusion of the bench trial, Devon argues that, because this Court had already determined that the Ordinance was facially unconstitutional, its remaining claims are moot, and that the sole remaining issue is a determination of Devon's damages. Alternatively, Plaintiff argues that the Township's application of the Ordinance is unconstitutional *as-applied*. Plaintiff argues that Defendant applied the Ordinance unconstitutionality to Devon when the Township

allowed Police Chief Obzud to exercise unfettered discretion and subjective judgment in setting the cost for support services.[64]  Specifically, Plaintiff contends that, in the years 2022, 2023 and 2024, Police Chief Obzud exercised a subjective, unlimited discretion in deploying police officers — including himself  and Lieutenant Sesher — to the Devon Horse Show, and calculating  the cost of the police deployment based on the number of hours each officer served at the rate of pay at time and a half, presumably pursuant to the CBA.[65]

In response, the Township argues that Police Chief Obzud exercised this authority in a responsible and non-discriminatory manner by ensuring police coverage at the event sponsor's expense (here Devon) only when the Special Event was likely to draw a large number of persons which could give rise to threats to public safety and order, and which could impact public property or roadways with extraordinary traffic and pedestrian management challenges.[66]  The Township further contends that it did not restrict or prevent Plaintiff from conducting its annual Devon Horse Show and, therefore, did not violate Plaintiff's right to freedom of association or speech as protected by the First Amendment.[67]  However, the Township did not present any evidence to support the reason for the *significant* amount of law enforcement personnel it provided and for which it required Devon to pay, nor of a specific direct threat to the Devon Horse Show or any

---

[64]   The parties have devoted significant briefing on the issue of the applicable standard to consider for Plaintiff's as-applied claim — Defendant advocating for the application of intermediated scrutiny and Plaintiff arguing that, if any level of scrutiny applies, it should be strict scrutiny.  Neither party has identified persuasive precedent in support of their respective position in what appears to be one of first impression.

Notably, the Third Circuit in *The Nationalist Movement* did not explicitly strike down the lower courts method of analyzing that plaintiff's *as-applied* challenge by evaluating the parties' arguments as to whether the evidence showed the conduct alleged illustrated an unconstitutional application.  *See The Nationalist Movement v. City or York*, 425 F. Supp. 2d 574, 587-88 (M.D. Pa. 2006) (analyzing *as-applied* claim on the basis of the plaintiff's arguments of its unconstitutional treatment by way of an ordinance and the evidentiary support for the same).  This Court is guided by the same approach.

[65]      (ECF 81 at ¶ 99).

[66]      (ECF 82 at ¶ 11).

[67]      (*Id.* at ¶ 13).

horse shows nationwide to justify the number of law enforcement assigned to work the Devon Horse Show.

The evidence presented at trial, particularly through Wayne Grafton, the CEO and Chairman of the Horseshow, Elizabeth Wright, a Devon Horse Show organizer, and Police Chief Obzud, show that, during the period that the Township was enforcing the 2018 Ordinance, no objective standard existed to determine the appropriate fees the Township could charge Devon for holding its events. In fact, the permit fees were at the autonomous discretion of the Township and, because most of the services were related to support services, these support services were largely determined by the unfettered discretion of Police Chief Obzud. The Township's former manager, Eugene Briggs, does not contest this conclusion:

> Q.   Okay then do you have – did you have an understanding at the time you were in the position of Township manager as to how the township accounted for the hours that were actually incurred during the Show to provide police services?
>
> A.   It was determined by the Police Chief.[68]

Further, the 2018 Ordinance did not set an objective standard for Devon to predict the fees it would be obligated to pay. The Township simply determined the charge, without any objective standard other than apparently the per-hour rates of the officers who were assigned to provide services at the event, including the chief of police for all the hours of Devon Horse Shows' operation, calculated at 150% of their respective hourly rate.

The testimony from Ms. Wright, who attested to discussing the safety plan with the Township ahead of each show, demonstrates that Devon had no say over the ultimate staffing of police outside the show, despite hiring its own security force. The Township had plenary control over how many officers were needed and staffed to work in and outside the show grounds, where

---

[68]   (ECF 85 at 95:10-15).

the officers were stationed and for how long, and how much to charge for that service, with no

*objective* way of determining each.[69]

The Township contends that it did not restrict or prevent Plaintiff from conducting its

annual Devon Horse Show and, therefore, did not violate Plaintiff's right to freedom of association

or speech as protected by the First Amendment.[70]  Though the evidence presented at trial and the

arguments proffered in post-trial briefing shows that the Township apparently never expressly

prevented Devon from holding its events, it did treat Devon as beholden to it.[71]  The Devon Horse

Show is the largest event held in the Township and the only event expressly addressed in the CBA

as a "unique opportunity" to generate income for the Township and its police officers.  The CBA

explicitly provided for *increased pay rates* for the police officers who provide services at the

---

[69]       (*See e.g.* ECF 86 at 87:16-88-6) (testimony from Mr. Grafton).

Q.       Does Devon Horse Show tell Eastown Township how many police officers it wants at what location?

A.       No, not that I am aware of.

Q.       Did you ever ask Easttown Township to stop charging a flat fee?

A.       No.

Q:       Did you ever ask Chief Obzud to eliminate Commander Positions at Devon Horse Show?

A.       I don't even know what a Commander Position is, so, no.

Q.       Did you ever ask Easttown Township to eliminate particular posts, for example, behind the show?

A.       No.

Q.       Does Devon Horse Show have any control over how many officers or how many hours of every day during the Horse Show officers are stationed at the show?

A.       No, I see the result of their analysis.

[70]       (*Id.* at ¶ 13).

[71]       (*See* ECF 69 at ¶¶ 8, 12-13, 15).

Devon Horse Show and an administrative fee for the Police Department.[72]  Further, as noted, the Township has not presented any evidence to demonstrate its need for such a significant number of law enforcement personnel which it required Devon to pay, nor of a specific direct threat to the Devon Horse Show or any horse shows nationwide to justify the number of law enforcement assigned to work the Devon Horse Show.

Under these circumstances, this Court finds that the delegation to, and discretion of, Police Chief Ozbud was overly broad and an invalid restriction to time, place, and manner.  Further, the Township failed to use adequate standards or guidelines when determining the fees for the Special Event Permits, thus, violating Devon's First Amendment rights.  As such, this Court finds that the 2018 Ordinance was unconstitutional *as applied* to Devon.

**B.    *Pennsylvania Constitution Uniformity Clause, Plaintiff's Tax Claim (Count III)***

Devon argues that the support services fees invoiced by the Township pursuant to the 2018 Ordinance were impermissible taxes that violated the Uniformity Clause of the Pennsylvania State Constitution.  Specifically, Devon argues that the support services fees were wholly unreasonable and excessive, were designed to increase income and, therefore, constitute an unconstitutional tax. In response, the Township argues that Devon has failed to present any evidence that it has been forced to pay more than the reasonable value of the services provided.[73]  The Township also argues that its charges for police and public works support services were equal to its actual costs incurred to provide the services, with no additional costs charged to Plaintiff.[74]

Under the Uniformity Clause of the Pennsylvania Constitution, "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the

---

[72]    (*See id.*).

[73]    (ECF 84 at ¶ 10).

[74]    (ECF 82 at ¶ 35).

tax . . . ." Pa. Const. art. 8, § 1. "If anything can be considered as settled under the decisions of . . . Pennsylvania courts[,] it is that municipalities under the guise of a police regulation cannot impose a revenue tax." *Kittanning v. Am. Nat. Gas Co.*, 86 A. 717, 717 (Pa. 1913). However, "[i]t has been recognized consistently by judicial authority that where it is necessary in the proper conduct of business that unusual demands be made on the city facilities, a reasonable charge may be made by the municipality to cover its actual expense in providing such special services[.]" *Am. Baseball Club v. Philadelphia*, 167 A. 891, 892 (Pa. 1933).[75] "A license fee is a customary incident of municipal authority. A license fee is valid if the amount thereof is reasonably commensurate with the actual cost to the municipality for special services rendered[.]" *Id.*

However, "if a license fee collects more than an amount commensurate with the expense of administering the license, it would become a tax revenue and cease to be a valid license fee." *Talley v. Commonwealth*, 553 A.2d 518, 519 (Pa. Commw. Ct. 1989). "The party challenging a license fee has the burden of proving that the fee is unreasonable." *Id.* at 520 (first citing *Hill v. Borough of Dormont*, 494 A.2d 15 (Pa. Commw. Ct. 1985); then citing *Stark v. Commonwealth*, 494 A.2d 44 (Pa. Commw. Ct. 1985)). "All doubt must be resolved in favor of the reasonableness of the fee, since the municipality must be given reasonable latitude in anticipating the expense of enforcing the ordinance." *Id.* "[I]n all cases where the reasonableness of the action of the administrative officer in fixing license fees is subject to the visitation of the courts, *if the discretion lodged in such an official is abused*, the courts will provide a remedy as the case arises." *Am. Baseball Club*, 167 A. at 893 (emphasis added).

---

[75]     *See also Kittanning Borough v. Kittanning Consol. Nat. Gas Co.*, 26 Pa. Super. 355, 361 (Pa. Super. Ct. 1904) ("[I]f a corporation 'so carries on its business as to justify, at the hands of any municipality, a police supervision of the property and instrumentalities used therein, the municipality is not bound to furnish such supervision for nothing, and may, in addition to ordinary property taxation, subject the corporation to a charge for the expense of the supervision[.]'" (quoting *Atl. & Pac. Tel. Co. v. Philadelphia*, 190 U.S. 160, 164 (1903)).

At the heart of this dispute is Devon's contention that over a number of years it has, through a subjective, unaccountable and unprincipled system, paid more for the Township's support services than have other event organizers/permittees, an allegation that the Township denies in its answer and through the testimony of Police Chief Obzud.[76]  Specifically, Police Chief Obzud testified that, rather than overcharging Devon, he worked the Devon Horse Show to save Devon on paying for multiple posts:

> Q:    Okay.  Can you tell the Court a little bit about prior to the hourly arrangement, how you were paid as the chief as requested from the Horse Show?
>
> A:    Sure.  So back when I first started, the representative I always dealt with [regarding] the Horse Show was a different gentleman . . . . [W]e'd go over posts and, you know, he more or less dictated like, hey, is there any way we can save money?  Is there any post we need, don't need?  And we always talked about that.  And that's constant every year for the Horse Show.  During that time, in order to save [Devon] money because [the Devon representative] was saying tight it was, you know, in probably early 2000's, I said, well, I can probably pick up and work posts because[,] at that time I was just being paid to work as, you know, an incident commander.  So[,] I was paid a flat fee to oversee everything at the Horse Show as opposed to being on a post.  And [the Devon representative] thought it was a good idea.  So[,] that's when I began working post as a way to kind of save [Devon] money essentially.
>
> Q:    So[,] instead of paying for a command post and a regular post that would be manned by an officer, you would do both?
>
> A:    Correct.

However, this arrangement appeared to change.  Police Chief Obzud and Lieutenant Sesher logged over 200 hours working at the Devon Horse Show in 2022.  When asked whether it was necessary for both he and Lieutenant Sesher to be at the Devon Horse Show for every hour it was in operation, Police Chief Obzud had no legitimate justification or explanation.[77]  However, Police

---

[76]    (*See* ECF 82 at ¶¶ 29-31).

[77]    (*See* ECF 85 at 168:23-174:9).

Chief Obzud explained that Lieutenant Sesher was posted at the back gate of the Devon Horse Show, directing traffic, which presumably any qualified police officer could do. Police Chief Obzud testified that he did not know how long Lieutenant Sesher was at that post on a given day.[78] Notably, Police Chief Obzud logged 100.75 hours of work, while Lieutenant Sesher logged 108.5 hours of work.[79]

After a careful breakdown, these numbers reveal that Police Chief Obzud and Lieutenant Sesher each worked an average of ten hours each day over the eleven-day event to direct vehicular and human traffic in and out of the event. This Court agrees with Plaintiff's argument that this scenario is simply implausible, or at least unnecessary, especially because there were other officers assigned at the points of entry and exit from the Devon Horse Show. The presence of a police chief and high-ranking deputies at high volume events in a Township is not unusual. However, charging Devon for nine to ten hours a day for these high-ranking officials, for each day of the eleven-day event, at their 150% overtime hourly rate for nearly every hour of the event does not appear to be necessary, more so when this event has never had a serious safety concern.

Additionally, pursuant to the CBA, the Township charged higher hourly rates for police officers working the Devon Horse Shows because the events were seen as "a unique opportunity for members of the Police Department to provide services and generate income to the mutual benefit of the parties."[80]

Therefore, based on the totality of evidence presented, this Court finds that Police Chief Obzud abused his discretion in charging for the fees discussed. Clearly, the Township and Police Chief Obzud used the 2018 Ordinance as a guise or a means to collect more than an amount

---

[78]     (*Id.*).

[79]     (ECF 69 at ¶ 59).

[80]     (Compl. Ex. F, ECF 2-2 at pp. 45-54); (Stipulated Facts, ECF 69 at ¶¶ 20-21);

commensurate with the expense of administering the Special Event Permit fee, resulting in a windfall for him and his officers.

**C.    Damages**

Plaintiff seeks compensatory damages pursuant to 42 U.S.C. § 1983, ("Section 1983"), attorneys' fees pursuant to 42 U.S.C. § 1988, ("Section 1988"), and refunds of all fees paid for the 2022, 2023, and 2024 Special Event Permits.  For the reasons set forth *infra*, this Court finds that nominal damages pursuant to Section 1983 and attorney's fees pursuant to Section 1988 are warranted.

**I.        42 U.S.C. § 1983 Damages**

**a.        Compensatory Damages**

"It is well settled that compensatory damages under [Section] 1983 are governed by general tort-law compensation theory."  *Allah v. Al-Hafeez*, 226 F.3d 247, 250 (3d Cir. 2000).  "In other words, 'damages are available under [Section 1983] for actions found to have been violative of constitutional rights and to have caused compensable injury.'"  *Id.* (cleaned up) (quoting *Carey v. Piphus*, 435 U.S. 247, 255 (1978)).  "[D]amages in tort cases are designed to provide compensation for the injury caused to plaintiff by defendant's breach of duty. . . . To that end, compensatory damages may include . . . out-of-pocket loss and other monetary harms[.]"  *Memphis Cmty. School Dist. v. Stachura*, 477 U.S. 299, 306-07 (1986) (internal quotations and citations omitted).  "Generally, compensatory damages should attempt to place the plaintiff in a position similar to the one she or he would have been in had the violation not occurred."  *Cunningham v. City of Overland, State of Mo.*, 804 F.2d 1066, 1069 (8th Cir. 1986), *abrogated on other grounds by Lemke v. Cass Cty., Neb.*, 846 F.2d 469, 470-71 (8th Cir. 1987) (*en banc*).

Devon argues that the proper measure of its compensatory damages is the fees that the Township charged and Devon paid pursuant to the 2018 Ordinance for the Special Event Permits

in 2022, 2023, and 2024; an Ordinance now determined to be unconstitutional.  In short, Devon seeks a total of $225,000 for three payments of $75,000.[81]  This Court disagrees.

Here, from 2016 to 2019, Devon had been paying a flat fee of $75,000 for Special Event Permits pursuant to a settlement agreement with the Township.  Devon has not disputed that the flat fee payments were impermissible or unconstitutional, as evidenced by the fact that it has not challenged the fee imposed for the 2019 Devon Horse Show, an event that took place *after* the Ordinance was amended in 2018.  Although the Township attempted to increase the Special Event Permit fee starting in 2022 and now seeks outstanding charges for those events totaling $51,128, Devon has continued to pay a flat $75,000 fee for the 2022, 2023, and 2024 Special Event Permits in order to receive services from the Township.  As such, to return Devon to a position similar to the one it would have been in had the Township continued to honor the settlement agreement would mean returning Devon to the settled payments of $75,000 for the Special Event Permits.

Given that Devon has continued to pay only a pre-event deposit of $75,000 for the 2022, 2023, and 2024 Special Event Permits,[82] and has not paid any outstanding invoices from the Township, this Court finds that Devon has not suffered an injury requiring compensatory damages.

b.      *Nominal Damages*

While Devon is not entitled to compensatory damages, "the Supreme Court recognize[s] . . . that certain absolute constitutional rights may be vindicated by an award of nominal damages in the absence of any showing of injury warranting compensatory damages."  *Allah*, 226 F.3d at 251 (internal citations omitted).  Here, this Court has found that the Township's enforcement of the 2018 Ordinance in the years 2022, 2023, and 2024 violated Devon's constitutional rights, but that no actual injury stemmed from the violation.  As a matter of law, "nominal damages may not

---

[81]     (ECF 81 at ¶ 101).

[82]     (Stipulated Facts, ECF 69 at ¶¶ 79, 88).

22

exceed one dollar." *U.S. ex rel. Tyrrell v. Speaker*, 535 F.2d 823, 830 (3d Cir. 1976). As such, this Court awards nominal damages in the amount of one dollar for each year that the Township violated Devon's constitutional rights, for a total of three dollars.

## II.        *Attorney's Fees*

"Under [Section] 1988, a 'prevailing plaintiff' in a civil rights action should ordinarily recover her attorney's fees." *Mancini v. Northampton Cnty.*, 836 F.3d 308, 320 (3d Cir. 2016). "A plaintiff is a 'prevailing party' for the purposes of an attorney's fee award if she succeeds 'on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Id.* (quoting *Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 163 (3d Cir. 2002)). Because Devon is a "prevailing plaintiff" in its Section 1983 suit, this Court finds that attorney's fees are appropriate here. As such, Plaintiff's counsel will be given the opportunity to submit by motion a specific request for attorney fees.

## III.        *Refund of Collected Fees*

Finally, Devon argues that all prior actions by the Township pursuant to the 2018 Ordinance that serve as a basis for the 2022, 2023, and 2024 Special Event Permit fees, whether that be deploying police officers or imposing a "Special Events" permit or a fee in any amount upon Devon, were legally invalid, and hence must be refunded. This Court disagrees.

While the Township has been found to have abused their discretion in setting the Special Event Permit fees in the years 2022, 2023, and 2024, Devon has not paid the actual amount invoiced by the Township for those years. Instead, Devon has paid an agreed amount of $75,000 for the services rendered by the Township. As previously discussed, this $75,000 fee is the same amount that Devon paid for Special Event Permits for the Devon Horse Shows that were held between the years of 2016 to 2019. Based on Devon's own agreement to pay $75,000 for the Township's services in prior years, this Court infers that the $75,000 for Special Event Permits was a reasonable permitting fee for the services rendered by the Township.

23

Additionally, to reimburse Devon the full $75,000 for 2022, 2023, and 2024 would provide Devon a windfall and work an injustice against the Township which is legally permitted to seek reimbursement for reasonable expenditures through permit fees. *See Am. Baseball Club v. Philadelphia*, 167 A. at 892 ("It has been recognized consistently by judicial authority that where it is necessary in the proper conduct of business that unusual demands be made on the city facilities, a reasonable charge may be made by the municipality to cover its actual expense in providing such special services[.]"). As such, this Court finds that, while Devon is not required to pay any outstanding invoices to the Township for the 2022, 2023, or 2024 Devon Horse Shows, it is not entitled to a refund of the amounts it has paid.

**CONCLUSION**

For the reasons set forth, based on the evidence of record, the arguments made, and the submissions filed, this Court finds that Devon has proven that the Township's issuance of Special Event Permits in the years 2022, 2023, and 2024 pursuant the 2018 Ordinance violated Devon's First Amendment rights, and the Uniformity Clause of the Pennsylvania Constitution. Accordingly, judgment will be entered in favor of Devon and against the Township pursuant to Federal Rule of Civil Procedure 58. Devon is entitled to nominal damages in the amount of one dollar for each year of the Township's constitutional violations, and attorneys' fees. A Judgment Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.

24